UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIMOTHY COLEMAN,

        Plaintiff,

v.                                                   Case No. 8:12-cv-71-T-24 AEP

LAKELAND AREA MASS
TRANSIT DISTRICT,

        Defendant.
_____/

**ORDER**

        This cause comes before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 27). Plaintiff opposes the motion. (Doc. No. 42). As explained below, the motion is denied.

**I. Standard of Review**

        Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

**II.  Background**

Plaintiff Timothy Coleman is an African American man that was hired by Defendant Lakeland Area Mass Transit as a mechanic in November of 1999.  (Doc. No. 38-1, ¶ 3).  He asserts race discrimination, racially hostile work environment, and retaliation claims based on the following events.

After Plaintiff was hired, Defendant promoted him from a "C" to a "B" and then to an "A" mechanic.  (Doc. No. 38-1, ¶ 3).  Thereafter, in November of 2006, Defendant promoted Plaintiff to shop foreman, which is the highest mechanic position.  (Doc. No. 38-1, ¶ 3).  During Plaintiff's employment, he and one other person, Neville Thomas, were the only African American mechanics employed by Defendant.  (Doc. No. 38-1, ¶ 27).

At the time Plaintiff was promoted to the shop foreman position, there were two shop foreman positions—one had the morning shift (from 4:00 a.m. to 12:30 p.m.) and the other had the later shift (the starting and ending times varied during Plaintiff's employment).  (Doc. No. 38-1, ¶ 11).  At the time of his promotion, Plaintiff was assigned to the later shift, and Glen Goddard (a caucasian male) had the morning shift.  (Doc. No. 38-1, ¶ 12).

Around July of 2007, Goddard was promoted to the position of maintenance manager, and the morning shop foreman shift became available.  (Doc. No. 38-1, ¶ 15).  Plaintiff asked Goddard to assign him to the morning shop foreman shift.  (Doc. No. 38-1, ¶ 19).  However, George Woodard, a caucasian male with less seniority than Plaintiff, was promoted from A mechanic to shop foreman and was given the morning shift in November of 2007.  (Doc. No. 38-1, ¶ 19).  The reason given to Plaintiff for assigning Woodard to the morning shift was that Woodard could not directly supervise his two sons (who were mechanics).  (Doc. No. 38-1, ¶ 22,

2

23).

Plaintiff contends that Defendant's reason for giving Woodard the morning shift was pretextual. Woodard's one son, Justin, had a shift from 9:00 a.m. to 5:00 p.m., so Justin's shift overlapped with Woodard's morning shift. (Doc. No. 38-1, ¶ 24). Woodard's other son, George, worked an evening shift, but he was placed under the supervision of an A mechanic, not the shop foreman. (Doc. No. 38-1, ¶ 25).

Prior to Woodard's promotion to shop foreman, some of the mechanics would tell Plaintiff that Woodard made racists remarks about Plaintiff at work, including calling Plaintiff a "nigger." (Doc. No. 38-1, ¶ 26; Doc. No. 39-32, ¶ 8). Plaintiff complained about the racist remarks to his maintenance managers, the Human Resources Manager (Deborah Porte), and the Executive Director (Danny Ours), but the racist remarks continued, even after Woodard was promoted. (Doc. No. 38-1, ¶ 26, 28, 29). At least one other mechanic, Harold Tuggle, complained to the Human Resources Manager and Executive Director about Woodard's racist comments. (Doc. No. 39-32, ¶ 9). Additionally, Plaintiff contends that at a shop meeting he attended, Woodard made the comment that "It's so easy, a bunch of monkeys can do it," and when Plaintiff asked who Woodard was referring to, Woodard responded that "it's only you and Thomas [the other black mechanic] here." (Doc. No. 38-1, ¶ 27).

Around April 14, 2008, Plaintiff submitted a written complaint regarding Woodard's racists remarks and harassment. (Doc. No. 38-1, ¶ 33 & Ex. F). Human Resources did not interview Plaintiff in connection with his complaint. (Doc. No. 38-1, ¶ 34). Instead, Human Resources concluded that it could not substantiate Plaintiff's allegation that Woodard had called him racist names. (Doc. No. 38-1, ¶ 35 & Ex. G). However, Plaintiff continued to receive

3

reports from other mechanics that Woodard was still calling Plaintiff racist names, and this continued until Woodard's employment ended in May of 2008. (Doc. No. 38-1, ¶ 36).

When Woodard's employment ended, the morning shift again became available, and Plaintiff requested that Goddard assign Plaintiff to it. (Doc. No. 38-1, ¶ 38). In September of 2008, Rita Wages (a caucasian female) replaced Goddard as maintenance manager. (Doc. No. 38-1, ¶ 41). Plaintiff asked Wages to assign him to the morning shift, but she did not. (Doc. No. 38-1, ¶ 43).

Plaintiff contends that Wages also created a racially hostile work environment. During Plaintiff's first interaction with her, Wages told Plaintiff that she had a lot of black friends. (Doc. No. 38-1, ¶ 42). This comment made Plaintiff uncomfortable and worried him, because he felt that she viewed him in terms of race. (Doc. No. 38-1, ¶ 42).

Beginning around November of 2008, mechanics would tell Plaintiff that Wages would call him "nigger." (Doc. No. 38-1, ¶ 44; Doc. No. 39-31, ¶ 11; Doc. No. 39-33, ¶ 13). Plaintiff complained to the Human Resources Manager and Executive Director, but reports of Wages' racists remarks continued throughout the rest of Plaintiff's employment. (Doc. No. 38-1, ¶ 44).

Two of Plaintiff's co-workers, Jimmy Doan and Harold Tuggle, recall an occasion where Wages said in reference to Plaintiff that she would "make sure that nigger is out of here." (Doc. No. 39-32, ¶ 12; Doc. No. 39-33, ¶ 11). Additionally, Tuggle recalls another occasion wherein Wages said that "because of his skin color, his black ass will be out of here." (Doc. No. 39-32, ¶ 14). Tuggle also recalls that Wages told him and others to tell her if they found out that Plaintiff was doing anything wrong so she could write Plaintiff up. (Doc. No. 39-32, ¶ 26). Furthermore, Tuggle and Doan contend that Wages constantly said that Plaintiff's skin color was

the only reason that Plaintiff was a foreman.  (Doc. No. 39-32, ¶ 13; Doc. No. 39-33, ¶ 10).

Before Wages took over as Plaintiff's supervisor, Plaintiff's duties as shop foreman included assisting in evaluating employees, recommending raises, scheduling, and hiring.  (Doc. No. 38-1, ¶ 46).  However, after Wages took over, she did not seek Plaintiff's assistance in these matters.  (Doc. No. 38-1, ¶ 46).  As a result, although Plaintiff still held the position of shop foreman, he was essentially a regular mechanic performing only bus maintenance work.  (Doc. No. 38-1, ¶ 46).  Plaintiff complained to the Human Resources Manager and Executive Director, but these duties were never restored.  (Doc. No. 38-1, ¶ 47).

In June of 2008, prior to Wages becoming Plaintiff's supervisor, Goddard had awarded Plaintiff a 3.5% merit raise, increasing Plaintiff's hourly pay rate from $24.53 to $25.39.  (Doc. No. 38-1, ¶ 48).  However, in October of 2008, after Wages took over, Defendant took away the merit increase.  (Doc. No. 38-1, ¶ 48).  Wages and the Human Resources Manager told Plaintiff that this was necessary because "discrepancies" were found in Plaintiff's pay, and he should not have been given the raise because he was topped out on the pay scale.  (Doc. No. 38-1, ¶ 48).  Plaintiff questions Defendant's reason for taking away his raise, because his prior supervisor and the Human Resources Manager had signed off on it.  (Doc. No. 38-1, ¶ 50).  As a result, Plaintiff's hourly pay was reduced back to $24.53.  (Doc. No. 38-1, ¶ 49).

Also in October of 2008, Wages told Plaintiff not to supervise employees, because the mechanics did not need supervision.  (Doc. No. 38-1, ¶ 51).  Plaintiff complained to the Human Resources Manager and Executive Director, but nothing was done.  (Doc. No. 38-1, ¶ 51).  If Plaintiff informed Wages of a mechanic's performance deficiency or misconduct, Wages would respond, "You are not the police."  (Doc. No. 38-1, ¶ 52).

In November of 2008, Wages promoted Jimmy Doan (who is Asian) to the shop foreman position left by Woodard and gave Doan the morning shift. (Doc. No. 38-1, ¶ 53). Defendant stated that the reason Doan was given the morning shift was because Plaintiff's skills were not up to par and Doan had skills relating to fixing fare boxes on the buses that Plaintiff did not have. (Doc. No. 30-1, p. 19; Doc. No. 28-1, depo p. 66).

However, Plaintiff argues that Defendant's reasons for giving Doan the morning shift are pretextual. Specifically, Plaintiff points out that he repeatedly asked Wages to explain how he was not up to par, but she did not provide an explanation or identify any deficiencies. (Doc. No. 28-1, depo p. 66; Doc. No. 29-1, p. 199). With respect to Doan having skills relating to fixing fare boxes, Plaintiff contends that he knew how to fix fare boxes and trained Doan on how to do it. (Doc. No. 29-1, p. 196; Doc. No. 38-1, ¶ 55). Additionally, while Doan received additional training relating to the fare boxes, Plaintiff had requested the additional training but was denied because his duties as shop foreman did not require such training. (Doc. No. 29-1, p. 197; Doc. No. 38-1, ¶ 55). Furthermore, to the extent that someone with the additional fare box training was needed on the morning shift, Hector Torres also received the training and was a mechanic on the morning shift. (Doc. No. 38-1, ¶ 55).

In mid-January of 2009, Plaintiff met with Wages, and they discussed the scheduling of mechanics on Saturdays. (Doc. No. 38-1, ¶ 56, 57). Plaintiff objected to scheduling Thomas (an African American mechanic) every Saturday, while the two other caucasian C mechanics were scheduled every other Saturday. (Doc. No. 38-1, ¶ 57). Wages responded in a rude tone that Plaintiff should mind his own business. (Doc. No. 38-1, ¶ 57). A few days after this meeting, Plaintiff's shift was changed to a later time—from 2:00 p.m. to 10:30 p.m. (Doc. No.

38-1, ¶ 58).

John Fay, a caucasian A mechanic, was also on the later shift. (Doc. No. 38-1, ¶ 58). Fay was hired by Defendant in January of 2009. (Doc. No. 38-1, ¶ 58). Wages told Plaintiff not to supervise Fay, as she contended that Fay did not need supervision. (Doc. No. 38-1, ¶ 59). Plaintiff attempted to report Fay's inappropriate conduct to Wages, but she told Plaintiff to mind his own business and pointed out that Plaintiff was not the police. (Doc. No. 38-1, ¶ 60-62).

When Plaintiff would approach Wages' office, Wages usually would wave Plaintiff away. (Doc. No. 38-1, ¶ 63). Wages never treated caucasian employees in such a manner. (Doc. No. 38-1, ¶ 64). In fact, Wages often spent time socializing with caucasian mechanics. (Doc. No. 38-1, ¶ 65).

On February 3, 2009, Plaintiff was repairing an air conditioner on a bus, and Wages told Plaintiff not to "nigger rig" it. (Doc. No. 38-1, ¶ 67). Thereafter, Wages said "nigger rig" two more times in Plaintiff's presence. (Doc. No. 38-1, ¶ 68). One of these times occurred while Stan Hough was working on a bus, and Wages said to Plaintiff that she hoped Hough did not "nigger rig" it. (Doc. No. 38-1, ¶ 68). The other time occurred when Wages said that she was tired of people "nigger rigging" the buses. (Doc. No. 38-1, ¶ 69).

During the first week of February in 2009, Plaintiff complained to the Human Resources Manager about the race discrimination that he witnessed, including Wages' "nigger rig" comment, the scheduling of Thomas on Saturdays, Wages calling Plaintiff racist names, and Plaintiff being denied the morning foreman shift. (Doc. No. 38-1, ¶ 70). At some point, Tuggle also complained to the Human Resources Manager about Wages' racism towards Plaintiff and Thomas. (Doc. No. 39-32, ¶ 17). On February 12, 2009, Plaintiff met with the Executive

Director about his race discrimination complaint and also complained about Wages prohibiting him from supervising employees. (Doc. No. 38-1, ¶ 71).

On March 17, 2009, the Executive Director sent Plaintiff a letter offering to change Plaintiff's shift time to 9:00 a.m. to 7:30 p.m. Monday through Thursday (four ten-hour days) or to 9:30 a.m. to 6:30 p.m. Monday through Friday (five eight-hour days) if Plaintiff would accept a demotion to a B mechanic and a pay cut. (Doc. No. 38-1, ¶ 72 & Ex. K). Plaintiff did not accept the offer to change his shift and become a B mechanic. (Doc. No. 38-1, ¶ 72).

In March or April of 2009, Wages came up to Plaintiff, grabbed his arm, and stated that she "didn't know black people's skin was so soft." (Doc. No. 38-1, ¶ 73). Plaintiff was humiliated and disgusted by this. (Doc. No. 38-1, ¶ 73).

In April of 2009, Plaintiff arrived at work to find that his desk, chair, and computer (but not his phone) had been moved from the foreman's office to the tool room. (Doc. No. 38-1, ¶ 74, 77). Wages told Plaintiff that the tool room was his new office, but she gave no reason why.[1] (Doc. No. 38-1, ¶ 74). The tool room was like a cage, because the front and side wall of the

---

[1] In its motion for summary judgment, Defendant argues that Defendant had a legitimate, non-discriminatory reason for moving Plaintiff into the tool room. (Doc. No. 27, p. 14). Specifically, Defendant contends that "it was explained to Plaintiff that Ms. Wages . . . understood he had been utilizing the separate Foreman's office to misuse the phone, make personal phone calls, play games, and watch tv on the computer." (Doc. No. 27, p. 14). In support of this contention, Defendant cites to Plaintiff's deposition testimony, in which Plaintiff states that Wages never told him why he was moved to the tool room, but after he filed suit, he learned that it was Wages' understanding that he had misused the foreman's office. (Doc. No. 28-1, depo p. 127-28). However, Plaintiff never identified in his deposition from whom he learned of Wages' understanding, and Plaintiff submitted a declaration that he learned of this purported reason via the litigation documents in this case. (Doc. No. 38-1, ¶ 85-86). Furthermore, Plaintiff states in his declaration that while he was employed with Defendant, no one ever directly accused him of misusing the phone, playing games, or watching tv. ((Doc. No. 38-1, ¶ 86). Defendant does not cite to deposition or affidavit evidence from Wages regarding her reason for moving Plaintiff's office, and as such, the Court declines to accept Defendant's proffered legitimate, non-discriminatory reason without a sufficient non-hearsay evidentiary basis.

room was made of cage wire, which allowed the diesel exhaust fumes from the buses to come in. (Doc. No. 38-1, ¶ 74-75). Plaintiff complained that the tool room was not fit for a person to work in due to the diesel exhaust fumes filling the room and there was no ventilation. (Doc. No. 38-1, ¶ 74-75). While working in the tool room, Plaintiff got sick from the fumes and was distracted by the noises of the buses and the mechanics entering and leaving with the tools. (Doc. No. 38-1, ¶ 76). The foreman's office stayed vacant while Plaintiff worked in the tool room. (Doc. No. 38-1, ¶ 78). Doan had his own office, which was not made of cage wire and was a safe distance away from the fumes. (Doc. No. 38-1, ¶ 80).

Plaintiff complained about being moved to the tool room to the Human Resources Manager, who referred Plaintiff to the Executive Director. (Doc. No. 38-1, ¶ 81). The Executive Director said that it was Wages' decision and did nothing about it. (Doc. No. 38-1, ¶ 81). Plaintiff worked in the tool room during the rest of his employment. (Doc. No. 38-1, ¶ 82).

Wages never performed Plaintiff's May 2009 annual performance review. (Doc. No. 38-1, ¶ 87). As a result, Plaintiff contends that he missed an opportunity to receive a performance bonus. (Doc. No. 38-1, ¶ 87).

On Friday, June 19, 2009, Plaintiff's shift was scheduled to end at 9:30 p.m. (Doc. No. 38-1, ¶ 88). Around 9:10 p.m., Fay informed Plaintiff that Fay had bumped the mirror on his bus while backing the bus into a parking spot. (Doc. No. 38-1, ¶ 88). When Plaintiff assessed the damage, he concluded that the minor damage would not affect the operation of the bus. (Doc. No. 38-1, ¶ 88). Fay was the only person involved in the accident, Fay was the only witness, and Fay was not injured. (Doc. No. 38-1, ¶ 88). Wages was not at work, and the dispatch department, which had the paperwork for accident reports, was closed. (Doc. No. 38-1, ¶ 88).

Since Plaintiff was due to be at work at 5:00 a.m. the next morning and Fay at 9:00 a.m., Plaintiff told Fay that Fay could fill out the accident paperwork in the morning. (Doc. No. 38-1, ¶ 88).

When Plaintiff arrived at work the next morning at 5:00 a.m., Wages was not there, and Plaintiff informed the dispatch department about the accident. (Doc. No. 38-1, ¶ 89). When Fay arrived at 9:10 a.m., Fay said that Wages had arrived and that he was going to tell Wages about the accident. (Doc. No. 38-1, ¶ 89). Thereafter, Wages sent Plaintiff home on unpaid administrative leave for an indefinite period of time for failing to immediately notify her about the accident. (Doc. No. 38-1, ¶ 91). Plaintiff contends that he is unaware of any policy that required him to immediately notify Wages of the accident, and Wages did not identify such a rule. (Doc. No. 38-1, ¶ 92, 96).

Fay was sent home on June 20, 2009. (Doc. No. 38-1, ¶ 90). It is unclear as to what disciplinary action, if any, was taken against Fay for being involved in the accident and failing to immediately report it. Furthermore, Fay's performance review for the period including the accident indicates that Fay was "accident free." (Doc. No. 39-28, p. 135-139).

Plaintiff was on administrative leave through July 2, 2009, at which time he attended a disciplinary meeting about the incident. (Doc. No. 38-1, ¶ 94-95). At the disciplinary meeting, Plaintiff was informed that he had been suspended without pay for five days during the administrative leave. (Doc. No. 38-1, ¶ 95).

Thereafter, on July 3, 2009, Plaintiff submitted a written race discrimination grievance to Defendant regarding Wages. (Doc. No. 38-1, ¶ 98; Doc. No. 27-7). On July 23, 2009, Plaintiff met with Defendant's attorney to discuss Plaintiff's grievance. (Doc. No. 38-1, ¶ 99).

Defendant's attorney was not sympathetic to Plaintiff's grievance. (Doc. No. 38-1, ¶ 99). The next day, Plaintiff filed a charge of race discrimination and retaliation with the EEOC. (Doc. No. 38-1, ¶ 100 & Ex. L).

On August 4, 2009 during Plaintiff's lunch break, Plaintiff was talking on his cell phone while walking within an authorized area for being on a cell phone pursuant to Defendant's call phone policy. (Doc. No. 38-1, ¶ 103). Plaintiff briefly stepped outside of the authorized area due to an obstruction blocking the pathway within the authorized area. (Doc. No. 38-1, ¶ 103, 104). As a result, on August 7, 2009, Wages put Plaintiff on unpaid administrative leave for violating Defendant's cell phone policy by using his cell phone outside of an authorized area. (Doc. No. 38-1, ¶ 102 & Ex. M). Plaintiff contends that the cell phone policy was selectively enforced against him, because he saw other employees, including Wages herself, use a cell phone while outside of an authorized area. (Doc. No. 38-1, ¶ 109).

On August 12, 2009, Wages sent Plaintiff a letter stating that she intended to terminate his employment for violating the cell phone policy. (Doc. No. 38-1, ¶ 111). By this time, the Executive Director was aware of Plaintiff's EEOC complaint. (Doc. No. 39-42, depo p. 78-84).

On August 20, 2009, Plaintiff met with the Executive Director about the cell phone incident and explained that Plaintiff believed that the cell phone policy had been selectively enforced against him, as Fay, Wages, and Stan Hough had used their cell phones outside of an authorized area without repercussion. (Doc. No. 38-1, ¶ 109, 112). However, on August 31, 2009, the Executive Director upheld Wages' decision to terminate Plaintiff's employment. (Doc. No. 38-1, ¶ 113).

Thereafter, Plaintiff filed this lawsuit against Defendant. In his amended complaint,

Plaintiff asserts twelve claims under Title VII and the Florida Civil Rights Act.[2] Specifically, in Counts II and VIII, Plaintiff alleges that he has subjected to a racially hostile work environment. Additionally, in Counts I - IV and VII - X, Plaintiff asserts race discrimination claims based on the following adverse employment actions: (1) being effectively demoted from being a shop foreman to a mechanic,[3] (2) being placed on a five day unpaid suspension for failing to immediately notify Wages of Fay's accident, and (3) being placed on unpaid administrative leave and terminated for violating the cell phone policy.[4] Finally, in Counts V, VI, XI, and XII,

---

[2]Claims under Title VII and the Florida Civil Rights Act are analyzed under the same analytical framework. See Chavez v. URS Federal Technical Services, Inc., 2013 WL 49722, at *4 n.1 (11th Cir. Jan. 3, 2013).

[3]In his complaint, Plaintiff titles his effective demotion claims as constructive demotion claims, but he clarifies in his response brief that he is asserting that he was effectively demoted from being a shop foreman to a mechanic due to the elimination of his merit raise, the elimination of many of his responsibilities (including supervising mechanics), and having his office moved into the tool room. The case law regarding effective demotions that do not involve a transfer or reassignment is not abundant, but given Plaintiff's allegations, the Court will let these claims proceed. See Aslam v. Bd. of Education of City of Chicago, 2008 WL 3978562, at *6 (N.D. Ill. Aug. 25, 2008)(stating that the jury could find that the plaintiff, who was stripped of indicia of his position and of responsibilities, was effectively demoted); Hutchinson v. Holder, 668 F. Supp.2d 201, 215 (D.D.C. 2009)(stating that significant changes in responsibilities, including elimination of supervisory duties, could be considered an effective demotion and an adverse employment action); Ohal v. Bd. of Trustees of the University of the District of Columbia, 100 Fed. Appx. 833, 834 (D.C. Cir. 2004)(stating that removal of supervisory responsibilities constitutes an adverse employment action); Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1995); Lorenzo v. St. Luke's-Rosevelt Hopsital Center, 837 F. Supp.2d 53, 67 (E.D.N.Y 2011)(stating that the removal of the plaintiff's credentialing duties was a functional demotion).

[4]Plaintiff's assignment to the later foreman shift (as opposed to the morning foreman shift) is not an adverse employment action under the facts of this case, as the morning shift was not more prestigious, did not come with an increased hourly pay rate, nor did it come with increased responsibilities. See Gonzalez v. Fla. Dept. of Highway Safety & Motor Vehicles, Division of Fla. Highway Patrol, 237 F. Supp.2d 1338, 1348 (S.D. Fla. 2002); Toney v. Montgomery Job Corps, 2006 WL 691188, at *7 (M.D. Ala. Mar. 15, 2006). Therefore, Plaintiff's assignment to the later foreman shift will not be considered with respect to the race discrimination claims based on discrete adverse employment actions, but instead, it will be

Plaintiff asserts retaliation claims based on the following adverse employment actions: (1) being placed on a five day unpaid suspension for failing to immediately notify Wages of Fay's accident, and (2) being placed on unpaid administrative leave and terminated for violating the cell phone policy.

### III. Motion for Summary Judgment

Defendant moves for summary judgment on all of Plaintiff's claims. As explained below, the Court denies Defendant's motion.

#### A. Hostile Work Environment

In order to establish a racially hostile work environment claim, Plaintiff must show that: (1) he belongs to a protected class (he is African American); (2) he was subjected to unwelcome harassment; (3) that harassment was based on his race; (4) the harassment was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is directly or vicariously liable for such environment. See Pizzini v. Secretary for Dept. of Homeland Sec., 495 Fed. Appx. 991, 993 (11th Cir. 2012). Upon review, the Court concludes that genuine issues of material fact preclude summary judgment on Plaintiff's hostile work environment claims.[5]

---

considered in connection with Plaintiff's hostile work environment claims.

[5]The Court notes that Defendant argues that it is entitled to prevail on the Faragher-Ellerth affirmative defense, which requires a showing that: (1) Defendant exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant or to otherwise avoid harm. See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). However, genuine issues of material fact exist that preclude summary judgment based on this affirmative defense. Furthermore, Plaintiff contends that the hostile work environment culminated into his termination, which would make the affirmative defense unavailable. See id. at 808.

**B. Race Discrimination**

In order to establish a prima facie claim of race discrimination, Plaintiff must show that: (1) he belongs to a protected class (he is African American); (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) his employer treated similarly situated, non-African American employees more favorably. See id. at 996. If Plaintiff establishes a prima facie claim, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions. See McMillan v. Fulton County Government, 349 Fed. Appx. 440, 442 (11th Cir. 2009). If Defendant proffers a legitimate, non-discriminatory reason for its actions, the burden shifts to Plaintiff to show that the proffered reason is pretextual. See id.

Plaintiff's race discrimination claims are based on three adverse employment actions. First, Plaintiff argues that he was effectively demoted from being a shop foreman to a mechanic due to the elimination of his merit raise, the elimination of many of his responsibilities (including supervising mechanics), and having his office moved into the tool room. It appears that Doan and Woodard, two non-African American shop foreman, were treated more favorably in this regard.

Second, Plaintiff argues that he was discriminated against by being placed on a five day unpaid suspension for failing to immediately notify Wages of Fay's accident.[6] Plaintiff appears to have been treated differently than Fay (a caucasian mechanic), who also did not immediately report the accident to Wages.

---

[6] The Court rejects Defendant's argument that the five day suspension was not an adverse employment action, because the suspension was unpaid. See McMillan v. Fulton County Government, 349 Fed. Appx. 440, 442 (11th Cir. 2009).

Third, Plaintiff argues that he was discriminated against by being placed on unpaid administrative leave and terminated for violating the cell phone policy.[7] Plaintiff argues that other caucasian mechanics (Fay and Hough), as well as Wages herself, had violated the cell phone policy and were not disciplined.

Defendant makes conclusory arguments that there are no similarly situated comparators and that it had legitimate reasons for its actions. However, upon consideration, the Court concludes that genuine issues of material fact preclude summary judgment on Plaintiff's race discrimination claims.

### C. Retaliation

In order to establish a retaliation claim, Plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. See Pizzini, 495 Fed. Appx. at 995. If Plaintiff establishes a prima facie claim, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for its actions. See McMillan, 349 Fed. Appx. at 443. If Defendant proffers a legitimate, non-discriminatory reason for its actions, the burden shifts to Plaintiff to show that the proffered reason is pretextual. See id.

Plaintiff's retaliation claim is based on two adverse employment actions. First, Plaintiff argues that he was retaliated against for complaining to the Human Resources Manager (Porte) and the Executive Director (Ours) regarding Wages' race discrimination. Plaintiff contends that this resulted in him being placed on a five day unpaid suspension (which was initiated on June

---

[7]Again, the Court rejects Defendant's argument that the administrative leave was not an adverse employment action, because the leave was unpaid. See McMillan, 349 Fed. Appx. at 442.

15

20, 2009 and was finalized on July 2, 2009), purportedly for failing to immediately notify Wages of Fay's accident on June 19, 2009. Plaintiff complained to Porte during the first week of February of 2009, and he complained to Ours on February 12, 2009. Ours sent Plaintiff a letter on March 17, 2009, in which Ours offered to put Plaintiff on a morning shift if he agreed to being demoted to a B mechanic and take a pay cut. Plaintiff declined Ours' offer. Thereafter, in April of 2009, Wages moved Plaintiff's office to the tool room, and Plaintiff again complained to Porte and Ours about Wages' treatment of him.

Given the continuing nature of Plaintiff's complaints and given the alleged continuing mistreatment of Plaintiff by Wages, the Court concludes that a genuine issue of material fact exists regarding whether Plaintiff's complaints and the five day suspension were causally connected. Furthermore, given the apparent disparate discipline given to Plaintiff and Fay for failing to immediately report Fay's accident, the Court concludes that genuine issues of material fact exist regarding whether Defendant has a legitimate reason for the suspension.

Second, Plaintiff contends that he was terminated on August 31, 2009 in retaliation for submitting a written race discrimination grievance to Defendant on July 3, 2009 regarding Wages and filing a charge of discrimination and retaliation with the EEOC on July 24, 2009. Given the close temporal proximately of these events, the Court concludes that a genuine issue of material fact exists regarding the causal connection element. Furthermore, given Plaintiff's assertion that other caucasian mechanics (Fay and Hough), as well as Wages herself, had violated the cell phone policy and were not disciplined, there is a genuine issue of material fact regarding Defendant's proffered legitimate reason for Plaintiff's termination.

## IV. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 27) is **DENIED**. The parties are directed to file their joint pretrial statement by May 30, 2013.

**DONE AND ORDERED** at Tampa, Florida, this 17th day of May, 2013.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record